**Maurice A. MAY, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 48S02–9909–CR–493.

Supreme Court of Indiana.

Sept. 23, 1999.

Patrick R. Ragains, Anderson, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

During a lunch break taken while Anderson Police Officer Steve Ohlheiser was testifying for the State against Defendant Maurice May, the officer encountered a juror in a restaurant. The two exchanged pleasantries and the juror invited the officer to watch a pay-per-view fight at his home the following weekend. We find that the trial court abused its discretion in denying Defendant's request to replace the juror with an alternate.

### Background

The facts most favorable to the verdict reveal that Defendant was a passenger in a vehicle that was pulled over for a routine traffic stop in the early morning hours of May 4, 1996. After being asked to exit the vehicle, Defendant fled, discarding a small plastic bag along the way. A chase ensued and Officer Steve Ohlheiser eventually tackled and apprehended Defendant. Officer Ohlheiser was injured in the melee, receiving abrasions and scrapes to his arms. The compound in Defendant's discarded bag tested positive for cocaine, and another small bag taken from Defendant contained a small amount of marijuana.

The State charged Defendant with Battery, a Class D felony;[1] Resisting Law Enforcement, a Class A misdemeanor;[2] Possession of Cocaine, a Class B felony;[3] and Possession of Marijuana, a Class A misdemeanor.[4]

During *voir dire*, one of the jurors, Mr. Hoover, indicated that he knew Officer Ohlheiser, although it appears that they had not seen each other for over fifteen years. At trial, the State began its case-in-chief by calling Officer Ohlheiser to the stand. Following an hour or so of direct examination by the State, defense counsel began his cross-examination of Officer Ohlheiser. Shortly thereafter, the court announced it would recess for lunch. Before adjourning, the court admonished the jurors not to discuss the case with anyone. During the lunch break, Officer Ohlheiser walked into a local restaurant, noticed Juror Hoover, and greeted him. They engaged in small talk which culminated in Juror Hoover inviting Officer Ohlheiser to his house the following weekend to watch a pay-per-view boxing match on television.

After reconvening, the State informed the trial judge about the extra-judicial juror communication. The trial judge conducted a hearing outside the presence of the jury, during which Officer Ohlheiser stated that the two had simply exchanged greetings. Not satisfied with this explanation, defense counsel insisted upon ques-

---

1. Ind.Code § 35–42–2–1(a)(2)(A) (Supp.1995).

2. *Id.* § 35–44–3–3 (1993).

3. *Id.* § 35–48–4–6(b)(2) (Supp.1995).

4. *Id.* § 35–48–4–11 (1993). Defendant was also charged with but not convicted of the separate offense of False Informing, a Class B misdemeanor. *Id.* § 35–44–2–2(c)(1).

tioning Juror Hoover who revealed the full extent of their discussion. Defense counsel objected to the juror's continued presence and asked the court to replace Hoover. The trial court overruled Defendant's objection and proceeded with the trial. Officer Ohlheiser re-took the stand and continued with his testimony.

The following morning before witnesses were called, the State offered "a solution to the problem." (R. at 252.) The State asked "if the defense would be willing to stipulate that if [the court] remove[d] Mr. Hoover and ... replace[d] him with an alternate," that the parties would agree to an eleven-person jury if for whatever reason they lost one more juror. *Id.* Defendant agreed to this compromise. After a short discussion of the matter, however, the trial judge again refused to replace Juror Hoover and continued the trial.

Defendant was convicted of Battery, Resisting Law Enforcement, Possession of Cocaine, and Possession of Marijuana. He appealed, claiming that he did not receive a fair trial by an impartial jury. The Court of Appeals affirmed, holding that the trial court did not abuse its discretion in refusing to replace the juror.[5] *May v. State,* 697 N.E.2d 70 (Ind.Ct.App.1998).

### Discussion

■ Article I, § 13, of the Indiana Constitution guarantees a defendant's right to an impartial jury; therefore, a biased juror must be dismissed. Ind. Trial Rule 47(B) provides in part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will only reverse such determinations where we find them to be arbitrary, capri-

cious or an abuse of discretion. *Harris v. State,* 659 N.E.2d 522, 525 (Ind.1995) (citing *Campbell v. State,* 500 N.E.2d 174, 181 (Ind.1986); *Woolston v. State,* 453 N.E.2d 965, 968 (Ind.1983), *reh'g denied* ).

■ In cases alleging juror misconduct involving out-of-court communications with unauthorized persons, a rebuttable presumption of prejudice exists. *Timm v. State,* 644 N.E.2d 1235, 1237 (Ind.1994); *Fox v. State,* 560 N.E.2d 648, 653 (Ind. 1990) (collecting cases). Such misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred and that it pertained to a matter pending before the jury. *Currin v. State,* 497 N.E.2d 1045, 1046 (Ind.1986).

■ Typically, "[t]he trial court [is] in the best position to assess the honesty and integrity of [a juror and their] ability to perform as a conscientious, impartial juror." *Harris,* 659 N.E.2d at 525. This is especially true where the trial judge must weigh the nature and extent of a juror relationship with a party or witness *established pre-trial* and arising in the normal, and often inevitable, course of interaction in an employment or community environment. As such, our review of the trial court's decisions in these matters is highly deferential. *See, e.g., McCants v. State,* 686 N.E.2d 1281, 1285 (Ind.1997) (affirming the trial court's refusal to grant a mistrial on the basis of jury bias because the State's witness worked at the same university as a juror); *Whatley v. State,* 685 N.E.2d 48, 49 (Ind.1997) (holding that trial court did not err in refusing to replace a juror when the juror became aware, during trial, that he may have known the defendant); *Harris,* 659 N.E.2d at 525 (affirming the trial court's decision to not replace a juror who revealed she had a happenstance meeting at a gas sta-

---

**5.** We note that Defendant argued and the Court of Appeals considered whether the trial court erred in choosing not to admonish the jury after removing a separate juror; that juror had admitted her incompetency on an unrelated matter during deliberations, and the trial court replaced her with an alternate. Our resolution of this case obviates the need for us to address the issue.

tion with a State witness the weekend prior to trial); *Creek v. State*, 523 N.E.2d 425, 427 (Ind.1988) (affirming the trial court's decision to permit a juror to remain impaneled even though that juror was employed by the same company and had casual contact with a party or witness).

■ On the other hand, juror conduct *with witnesses* occurring *contemporaneous to the trial proceeding* are of a different character and more directly implicate the public's trust and confidence in our criminal justice system. Under certain circumstances, the extra-judicial juror conduct is so fundamentally harmful to the appearance of the fair and impartial administration of justice, it will be considered "prima facie prejudicial" to the defendant, irrespective of whether the communication concerned a matter pending before the jury. *Woods v. State*, 233 Ind. 320, 119 N.E.2d 558 (1954); *Kelley v. State*, 555 N.E.2d 140 (Ind.1990).

On two previous occasions, this Court has reversed convictions when a State witness has socialized with members of the jury on a lunch break, beyond that which was necessary to be polite. In *Woods v. State*, police officers serving as State witnesses were fraternizing with the jury during intermissions and recesses. Even without a showing that the case had been discussed during these visits, this Court held that reversal was required because the extra-judicial conduct was prima facie prejudicial to the defendant. 233 Ind. at 324, 119 N.E.2d at 560–61. This Court noted that "it would be all too easy for the jury *unconsciously* to be influenced as to these matters by a friendly association with the witnesses for the State." *Id.* at 323, 119 N.E.2d at 560 (emphasis added).

More recently in *Kelley v. State*, we found *Woods* controlled in warranting reversal of a conviction because the State's only witness socialized with three of the six jurors during a lunch break. *Kelley*, 555 N.E.2d at 141. We reversed "[d]espite the lack of clear evidence that the [witness] and the jurors discussed the trial

proceedings and despite the three jurors' assertions that their impartiality was intact." *Id.* at 142. We quoted Judge Stanley Miller's unpublished dissent to the Court of Appeals decision in that case, which is worth repeating in part here:

> "[A]s it pertains to the issue of witness credibility, the prejudice which results from a juror's association with the prosecutorial witness can be an invisible prejudice (or bias) which festers within the subconscious mind of the fact finder. The taint caused by an improprietous association may be impossible to remove.
>
> [T]he complained of conduct in the present case was of such a prejudicial and inflammatory nature—based on the probable persuasive effect of the conduct on the jury's ability to assess witness credibility—as to place [the defendant] in a position of grave peril to which he should not have been subjected...."

*Id.* (first and second alterations in original) (emphasis omitted).

■ In the instant case, Officer Ohlheiser revealed to the prosecution that a contact with a juror had taken place during lunch recess. When the trial judge first questioned Ohlheiser about this communication, he admitted that he had initiated the contact with the juror, but stated that their conversation had consisted merely of "[j]ust, how ya doin', you look good, haven't seen you in a long time, bye." (R. at 192–93.) Only after defense counsel insisted upon questioning the juror, was it revealed by Juror Hoover that he "was going to show the pay[-per-]view of the boxing match [that upcoming weekend] and that [Ohlheiser] was invited to come by the house." (R. at 195.)

As the Court of Appeals observed, "Juror Hoover displayed a comradery with the witness and, thus, potential partiality." *May*, 697 N.E.2d at 72. This lunchtime communication also took place in the middle of Officer Ohlheiser's cross-examina-

tion. We find this extra-judicial juror communication to be more than just the mere exchange of pleasantries. In response to a greeting by a primary State witness, a juror openly extended a social invitation to this witness to gather at the juror's home the weekend immediately following the trial. This communication was in direct violation of the trial judge's admonishment to the jurors "during the trial [to] not talk to any of the parties, lawyers or any witnesses." (R. at 197.) Furthermore, this invitation was made in plain view of the public and possibly in the presence of other jurors.[6]

Not only was this conduct " 'prejudicial and inflammatory [in] nature,' " but it no doubt affected Juror Hoover's " 'ability to assess [Ohlheiser's] credibility' " as a witness. *Kelley,* 555 N.E.2d at 142 (quoting Judge Miller's unpublished dissenting opinion). While it was, in fact, Juror Hoover who extended the invitation, it was Officer Ohlheiser who had struck up the initial conversation between two individuals who had not seen each other in fifteen years. The result was "to place [Defendant May] in a position of grave peril to which he should not have been subjected." *Id.* The trial judge could have easily remedied the situation by replacing Hoover with the available alternate juror. Accordingly, we hold that it was an abuse of discretion to deny Defendant's motion to replace the juror.

### Conclusion

We therefore grant transfer, vacate the decision of the Court of Appeals, reverse the trial court, and remand for a new trial.

SHEPARD, C.J., and DICKSON, SELBY, and BOEHM, JJ., concur.

---

6. During the *voir dire* of Juror Hoover as to his extra-judicial contact, there was no inquiry as to whether other jurors had observed the witness-juror fraternization. Upon completion of *voir dire,* the trial judge merely instructed Hoover with "please don't tell the other jurors why you came in." (R. at 196.)